## UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| ANTHONY MONROE,<br>an individual,<br><br>           Plaintiff,<br><br>   v.<br><br>Terry Conner in his individual capacity as a law enforcement officer with the Louisiana State Police; Richard Matthews in his individual capacity as a law enforcement officer with the Louisiana State Police; Lamar Davis in his official capacity as the Superintendent of the Louisiana State Police; Chavez Cammon, in his official capacity as Records Custodian, Louisiana State Police; and DOES 1-10,<br><br>           Defendants. | Civil Action No. 5:21-cv-04063<br><br>**Complaint For:**<br><br>**(1) Excessive Force (42 U.S.C. § 1983)**<br><br>**(2) Conspiracy (42 U.S.C. §§ 1983 and 1985)**<br><br>**(3) *Monell* Liability for Failure to Supervise, Failure to Investigate and Failure to Decertify (42 U.S.C. § 1983)**<br><br>**(4) Aggravated Assault (L.A. Rev. Stat. § 14:37)**<br><br>**(5) Aggravated Battery (L.A. Rev. Stat. § 14:34)**<br><br>**(6) L.A. Rev. Stat. Ann. § 14:1 *et seq*. – Violation of Louisiana Public Records Law**<br><br>**<u>DEMAND FOR JURY TRIAL</u>** |

## <u>COMPLAINT</u>
## <u>NATURE OF THE ACTION</u>

1.     On November 29, 2019, Plaintiff Anthony Monroe ("Mr. Monroe")—a Black man—was violently beaten by two Louisiana State Police ("LSP") officers.

2.     This was not the first instance of a Black person being attacked by LSP officers.

3.      LSP has a long history of violence, discrimination, and police misconduct against Black people.[1]  Just six months prior to Mr. Monroe's attack, 49-year-old Ronald Greene was killed by LSP officers during an arrest and violent beat down.  A subsequent cover-up by LSP sparked national outrage and multiple calls for a federal Department of Justice (DOJ) probe.[2]  Moreover, external investigations have revealed a long pattern of racist violence and corruption by LSP.[3]  Ronald Greene's death, along with countless other less publicized cases, shed light on the rampant misconduct and brutality that has plagued LSP for years.[4]

4.      A review by the Associated Press of internal records and videos related to at least a dozen cases revealed that, over the past decade, LSP officers or supervisors ignored or concealed evidence of beatings, including turning off body cameras, rubberstamping use-of-force reports without reviewing body camera footage, and lying about suspects being violent to justify use of excessive force.[5]

5.      Mr. Monroe is just one of many other victims who has suffered violence at the hands of LSP and its officers.  Now, Mr. Monroe brings this lawsuit to redress the deprivation of his constitutional rights.

6.      Louisiana's one-year liberative prescription period for causes of action pursuant to 42 U.S.C. § 1983 contributes to the systemic lack of justice for victims of police brutality in Louisiana.  The one-year liberative prescription

---

[1] *See, e.g.,* Timothy Bella, *State troopers texted about the 'whoopin' they gave a Black man, records show: 'He's gonna have nightmares,'* The Washington Post (Mar. 13, 2021, 4:29 PM), https://www.washingtonpost.com/nation/2021/03/13/louisiana-police-black-man-text; Jim Mustian et al., *Beatings, buried videos a pattern at Louisiana State Police*, AP News (Sept. 8, 2021), https://apnews.com/article/police-beatings-louisiana-video-91168d2848b10df739d73cc35b0c02f8.

[2] Alanah Odoms et al., *Pattern-or-Practice Investigation into Louisiana State Police*, ACLU Louisiana (Aug. 27, 2021), https://www.laaclu.org/sites/default/files/8.27.21_letter_to_doj_re_lsp_investigation.pdf.

[3] *Id.*

[4] Jim Mustian, *AP: Use of slurs not 'isolated' at Louisiana State Police*, AP News (Oct. 30, 2020), https://apnews.com/article/race-and-ethnicity-louisiana-baton-rouge-racial-injustice-d7f77f196571892d71bd010ce4109677.

[5] *Beatings And Buried Videos Are A Pattern With The Louisiana State Police*, NPR (Sept. 9, 2021), https://www.npr.org/2021/09/09/1035446605/louisiana-state-police-bodycam-videos-beatings.

COMPLAINT
DEMAND FOR JURY TRIAL

period violates the intent of governing Supreme Court precedent and bars countless Louisiana citizens from exercising their civil rights.

7.     Mr. Monroe is among numerous Black men who have been brutalized by law enforcement without justification or justice.[6]  Louisiana's one-year liberative prescription period allows law enforcement, especially LSP, to continue to violate the rights of people like Mr. Monroe without any consequences.

8.     Mr. Monroe brings this action for (i) excessive force in violation of 42 U.S.C. § 1983; (ii) conspiracy in violation of 42 U.S.C. §§ 1983 and 1985; (iii) failure to supervise, investigate, and decertify officers under *Monell* in violation of 42 U.S.C. § 1983; (iv) aggravated assault in violation of L.A. Rev. Stat. § 14:37; (v) aggravated battery in violation of L.A. Rev. Stat. § 14:34; and (vi) a violation of the Louisiana Public Records Law.

9.     Louisiana courts have applied Louisiana's one-year liberative prescriptive period for delictual actions to all Section 1983 cases.[7]  However, Mr. Monroe submits that this rote application of the one-year period contradicts Supreme Court precedent.

10.     Mr. Monroe requests that this Court clarify that the correct statute of limitations period is four years pursuant to 28 U.S.C. § 1658, or, alternatively, that the holding in *Owens v. Okure*, 488 U.S. 235 (1989) is limited to those states that have a residual statute of limitations that is longer than any more applicable particularized statute of limitations.  Accordingly, if the four-year statute of limitations under § 1658 does not apply, then the more particularized two-year statute of limitations for crimes of violence applies.

---

[6] *See* Frank Edwards, et al., *Risk of being killed by police use of force in the United States by age, race – ethnicity, and sex*, 116 PNAS 16793, 16794 (2019) (finding that Black men are over two times more likely than white men to be killed by law enforcement); Mark Hoekstra & Carly Will Sloan, *Does Race Matter for Police Use of Force?  Evidence from 911 Calls,* NBER (Feb. 2020), https://www.nber.org/papers/w26774.

[7] *Williams v. Ouachita Par. Sheriff's Dep't*, 2017 WL 4401891, at *3 (W.D. La. Aug. 28, 2017) ("Relying on *Owens*, supra, all three federal district courts in this state have declined to apply Article 3493.10's two year prescriptive period to section 1983 claims").

COMPLAINT
DEMAND FOR JURY TRIAL

11.    Tort actions premised on aggravated assault and/or aggravated battery are subject to a two-year statute of limitations in Louisiana.

## THE PARTIES

12.    At all times relevant hereto, Mr. Monroe was a resident of the Western District of Louisiana and a citizen of the United States of America.

13.    At all times relevant hereto, Defendant Richard Matthews ("Defendant Matthews") was an officer at LSP.  On information and belief, Defendant Matthews resides in Haughton, Louisiana.  Defendant Matthews is sued in his individual capacity, and at all relevant times, he was acting under the color of law of the State of Louisiana.

14.    At all times relevant hereto, Defendant Terry Conner ("Defendant Conner") was an officer at LSP.  On information and belief, Defendant Conner resides in Shreveport, Louisiana.  Defendant Conner is sued in his individual capacity, and at all relevant times, he was acting under the color of law of the State of Louisiana.

15.    At all times relevant hereto, Defendant John Doe Officer ("Defendant John Doe") was an officer at LSP.  Mr. Monroe is not aware of the true name of Defendant John Doe, and therefore sues him by such fictitious name.  On information and belief, Defendant John Doe resides in the Western District of Louisiana.  Defendant John Doe is sued in his individual capacity, and at all relevant times, he was acting under the color of law of the State of Louisiana. Mr. Monroe will amend this complaint to state the true name of Defendant John Doe when it has been ascertained.

16.    Defendant Matthews and Defendant Conner, together with Defendant John Doe, are "Defendant Officers."

17.    Defendant Lamar Davis ("Defendant Davis") is the Superintendent of LSP and is the principal and final policymaker of LSP.  He establishes the policies, practices, and customs used by LSP, and is responsible for the hiring, firing,

COMPLAINT
DEMAND FOR JURY TRIAL

training, and the supervision of all officers at LSP, including Defendant Officers. Defendant Davis is sued in his official capacity.

18.     At all times relevant hereto, additional Defendant John Doe Officers of LSP ("Doe Officers") were employed as officers by LSP and were the direct supervisors of Defendant Officers.  Mr. Monroe is not aware of the true names and capacities of Doe Officers and therefore sues them by such fictitious names.  On information and belief, Doe Officers reside in the Western District of Louisiana. Mr. Monroe will amend this complaint to state the true name and capacity of Doe Officers when such have been ascertained.

19.     At all times relevant hereto, Defendant Chavez Cammon ("Defendant Cammon") was the Custodian of Records for LSP.  Defendant Cammon is sued in his official capacity.

20.     Defendants are liable jointly, severally, and *in solido* for the intentional, excessive, and/or otherwise unconstitutional and tortious conduct set forth below.

## JURISDICTION AND VENUE

21.     This action seeks to redress the deprivation under color of law, statute, ordinance, regulation, custom, or usage of rights, privileges, and immunities secured to Mr. Monroe by the Constitution and laws of the United States. Mr. Monroe brings this action pursuant to 42 U.S.C. § 1983.

22.     This Court has subject matter jurisdiction over Mr. Monroe's claims pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3).

23.     This Court also has supplemental jurisdiction over all other claims asserted under the laws of the State of Louisiana, pursuant to 28 U.S.C. § 1367(a), because all of Mr. Monroe's claims arise out of a common nucleus of operative facts and are so related to the federal claims that they are part of the same case or controversy.

COMPLAINT
DEMAND FOR JURY TRIAL

24.     Venue is proper in the United States District Court for the Western District of Louisiana in accordance with 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to Mr. Monroe's claims occurred in Bossier City, Louisiana, which is located within this District, and the Defendant Officers reside in this District.

## FACTS COMMON TO ALL CLAIMS FOR RELIEF
### Mr. Monroe's Drive Home

25.     On November 29, 2019, at around 4:00 a.m., Mr. Monroe finished his shift at the Eldorado Casino in Shreveport, Louisiana, where he had worked as a blackjack dealer for twenty years.

26.     After finishing his shift, Mr. Monroe wanted to pick up some food on the way back to his home.  He got into his truck and drove in the direction toward his home.

27.     Mr. Monroe was driving on Market Street and turned onto I-20, when he noticed an LSP officer following him.  This LSP officer was Defendant Matthews.

28.     Defendant Matthews continued to follow Mr. Monroe for several minutes without turning on any police lights.

29.     Mr. Monroe turned off I-20 onto Traffic Street, which curved underneath the I-20 bridge.

30.     It was especially dark underneath the bridge, and there were no other cars or people around, aside from Mr. Monroe and Defendant Matthews.

31.     As Mr. Monroe approached underneath the bridge, Defendant Matthews suddenly turned his police lights on.  But Mr. Monroe did not understand why Defendant Matthews had turned on his lights.

32.     Mr. Monroe did not feel safe stopping underneath this bridge because it was very dark—only about 4:15 a.m. in the early morning with no sun or light out—and there were no other cars or individuals around.  Mr. Monroe had heard of

COMPLAINT
DEMAND FOR JURY TRIAL

police violence occurring in the area, and he was afraid of what might happen to him in the dark with no witnesses.  He had seen many news stories in the last year of LSP officers illegally targeting African Americans, arresting them without probable cause, dragging them out of their cars, beating them up, and violating their constitutional rights.  Mr. Monroe honestly feared being another victim on the news, especially in the dark, where he felt an LSP officer could do anything he wanted to him.

33.     Mr. Monroe reasonably decided that it would be safer to pull over in a well-lighted area so that it would be more probable that other people would be present to act as witnesses and potentially intervene in case the LSP officer became violent with him.  Mr. Monroe drove out from under the dark bridge and began looking for an appropriate location with more light to safely pull over.

34.     Mr. Monroe drove for less than a minute and pulled over at the first well-lighted area he found, which was the Boomtown Casino, located at 300 Riverside Drive in Bossier City.

### Mr. Monroe's Illegal Arrest

35.     Mr. Monroe pulled his truck into the valet area of the Boomtown Casino.  He stopped his truck and stayed seated in the driver's seat.  He remained calm despite being completely terrified—he thought he was going to be hurt or killed.

36.     Mr. Monroe watched Defendant Matthews get out of his police car. Defendant Matthews walked up to Mr. Monroe's truck and stood behind the truck on the driver's side.  Defendant Matthews reached for his gun, placing his hand over his gun in the holster.

37.     Defendant Matthews demanded that Mr. Monroe exit his truck, without providing any reason or justification, with his hand on his gun.

38.     Mr. Monroe was confused about being stopped for no apparent reason, terrified about what might happen to him if he got out of the truck, and

fearful for his life given the history of police brutality in the area and the stories of Black victims on the news, so he reasonably remained seated in his truck.

39.     Mr. Monroe, in his nervousness, called his mother on his cell phone. Mr. Monroe stayed on the phone with his mother as Defendant Matthews continued to demand that Mr. Monroe exit the truck.

40.     Mr. Monroe told his mother over the phone that the officer had his hand on his gun.

41.     Mr. Monroe spoke to Defendant Matthews through his rolled-down window.  Mr. Monroe continued to ask for an explanation as to why he had been pulled over.

42.     Defendant Matthews never informed Mr. Monroe why he was being pulled over, in violation of standard practice, and he continued to demand that Mr. Monroe exit his truck.

43.     Mr. Monroe's mother said to him over the phone, "don't give him a reason to pull his gun."

44.     It was only then, after hearing Mr. Monroe's mother's statements over the truck's Bluetooth, that Defendant Matthews removed his hand from his gun and instead grabbed his flashlight.  He shined his flashlight into the side mirror onto Mr. Monroe.

45.     Mr. Monroe told Defendant Matthews that he had high blood pressure and general bad health, and that he feared for his health in this situation. Mr. Monroe also told Defendant Matthews that he did not trust the situation and did not want to be handcuffed because of his medical conditions.

46.     Mr. Monroe asked Defendant Matthews if he planned to handcuff him, and Defendant Matthews said no.

47.     Mr. Monroe's mother, who was still on the phone and feared for her son's safety, told her son to get out of the truck.  She told her son to not give the officer a reason to shoot him.

COMPLAINT
DEMAND FOR JURY TRIAL

48.      When Mr. Monroe stepped out of the truck, Defendant Matthews immediately reached for both of Mr. Monroe's wrists, contrary to his earlier representation to Mr. Monroe that he would not be handcuffed.  Defendant Matthews also moved Mr. Monroe's hands towards Defendant Matthews' throat to make it look like Mr. Monroe was resisting arrest.

49.      Mr. Monroe pulled his hands away from Defendant Matthews.  But Defendant Matthews said ominously to Mr. Monroe, "I got you now."

50.      Suddenly and without any provocation whatsoever, Defendant Matthews drew his gun and pointed it at Mr. Monroe.

51.      During this entire time, Defendant Matthews had his body camera turned off, ensuring that there was no video evidence of his actions.

52.      Mr. Monroe, who believed the officer was trying to shoot and kill him, went back inside his truck for his own safety.

53.      By the time Mr. Monroe got back into his truck, other LSP officers had arrived, including Defendant Conner and Defendant John Doe.

54.      Mr. Monroe feared that Defendant Conner, Defendant Matthews, and Defendant John Doe (together, "Defendant Officers") were going to hurt him.  He began honking his truck horn for help.  Three people were standing outside in front of the casino, and a casino supervisor watched the incident through a window, but nobody came to help.

55.      By now, Defendant Matthews had finally turned on his body camera.

56.      Defendant Officers demanded that Mr. Monroe exit his truck. Mr. Monroe's mother, who was still on the phone, told him to get out of the truck to avoid getting shot.

57.      After Mr. Monroe exited his truck, Defendant Officers moved to arrest Mr. Monroe.  Defendant Officers did not read Mr. Monroe his Miranda rights.

COMPLAINT
DEMAND FOR JURY TRIAL

58.     Mr. Monroe asked why he was being arrested, but Defendant Officers would not give him any reason.

59.     Without provocation or justification, Defendant Officers violently slammed Mr. Monroe to the ground and placed him face down on the street.

60.     After Mr. Monroe was on the ground, all three Defendant Officers kneeled on Mr. Monroe's back and legs, putting their entire body weight on him and pinning him to the ground.

61.     Defendant Officers began beating Mr. Monroe.  They then violently twisted his arms to handcuff him.

62.     Mr. Monroe screamed and cried for help.

63.     Because Defendant Officers were putting their entire weight onto Mr. Monroe, who was still face down, Mr. Monroe felt like he was suffocating.

64.     Mr. Monroe began screaming, "I can't breathe!"  He tried to gasp out these words more than twenty times while he screamed and panted for air, but his screams were ignored.  Instead, Defendant Officers continued to beat him, even though he repeatedly pled with them to stop.

65.     Even though Defendant Matthews was fully aware that Mr. Monroe had a heart condition, Defendant Officers disregarded all of Mr. Monroe's pleas.  They all continued to put their entire body weight onto Mr. Monroe and beat him, preventing him from being able to fully breathe.

66.     One of the Defendant Officers violently drove his knee with force into Mr. Monroe's kidney.  This caused Mr. Monroe to urinate himself while pinned on the ground, as seen in the below picture:

COMPLAINT
DEMAND FOR JURY TRIAL



67.     While Mr. Monroe was pinned to the ground, he began to feel his chest tighten with extreme pain and discomfort.

68.     After Defendant Officers handcuffed Mr. Monroe, they left him on the ground.  Mr. Monroe continued to scream that he could not breathe, and he pled with Defendant Officers to help him.

69.     Defendant Officers eventually lifted Mr. Monroe from the ground.

70.     As Defendant Officers forced Mr. Monroe to a police car, they began to taunt him.  One of the Defendant Officers repeatedly told Mr. Monroe that Mr. Monroe's arrest had to be done "the hard way."

71.     While inside the police car, Mr. Monroe felt extremely dizzy, hot, and lightheaded, and his entire body went into a cold sweat.  Every bump in the road of the excruciating 45-minute ride caused him more pain.  His hands and body were swollen, and he went in and out of consciousness.  Mr. Monroe repeatedly asked the officer driving the vehicle to roll down the window, which the officer finally did after Mr. Monroe's repeated requests over the course of several minutes. Mr. Monroe later learned from LSU Health that he had suffered a heart attack.

COMPLAINT
DEMAND FOR JURY TRIAL

## **The Aftermath**

72.     As a result of this violent incident, Mr. Monroe suffered fractures in both of his wrists, and permanent injuries to his shoulders and arms.  Mr. Monroe was also declared disabled.

73.     Mr. Monroe was denied proper medical treatment at Benton Jail despite suffering a heart attack in the police car ride on the way there.

74.     At Benton Jail, Mr. Monroe begged the officers to take him to LSU Health for his injuries, but the officers told him "that wasn't gonna happen."  The officers told Mr. Monroe he looked "bloated," yet refused to take him to the hospital.

75.     A neighbor drove Mr. Monroe and his mother to the Emergency Room at LSU Health after he got out of Benton Jail.  He stayed in the LSU Health Emergency Room for two nights until he could be admitted to the hospital.  Mr. Monroe's doctor was not willing to let him go home because he believed Mr. Monroe might die from the fluid and bloating of his body due to the beating by the LSP officers, as seen in the below picture:



COMPLAINT
DEMAND FOR JURY TRIAL

76.     This incident affected both Mr. Monroe and his mother, who had been on the phone with Mr. Monroe before the beating occurred.  Devastatingly, his mother, who had remained on the phone, also overheard her son suffering the brutal violence exacted upon him by Defendant Officers.[8]

77.     The incident caused Mr. Monroe's mother a great deal of stress.  She suffered a major stroke and 13 minor strokes as a result of this stress, and she passed away.

78.     As a result of Defendant Officers' actions, Mr. Monroe lost everything that night.  Mr. Monroe had been a casino dealer for over twenty years, and had previously passed every background check.  But Defendant Officers fabricated criminal charges against Mr. Monroe, which meant he could no longer maintain his dealer's license.  Mr. Monroe was fired from his job at Eldorado Casino based on these fabricated charges.

79.     As a result of Defendant Officers' actions, Mr. Monroe now has post-traumatic stress disorder and experiences emotional trauma on a nearly daily basis.  The terror, torture, and nightmare of the incident still haunts him to this day.

80.      Mr. Monroe will never be able to return to a normal life.

## Failure to Supervise, Investigate, and Decertify

81.     Defendant Officers' unlawful actions could have been prevented had Defendant Officers been properly supervised.

82.     Defendant Officers were hired, supervised, and trained by Doe Officers.

83.     On information and belief, Defendant Davis and Doe Officers were aware that Defendant Officers were not properly trained on using an appropriate and legal amount of force (if any) when making an arrest.  Yet neither Defendant Davis nor Doe Officers chose to act or intervene.  Instead, they allowed Defendant

---

[8] Mr. Monroe's car door remained open after he exited his truck, allowing his mother to overhear Defendant Officers' attack of Mr. Monroe over his cellphone.

COMPLAINT
DEMAND FOR JURY TRIAL

Officers to continue carrying out their duties, despite knowing that Defendant Officers were not properly trained and, accordingly, constituted a danger to society.  This ultimately harmed Mr. Monroe, as he was unlawfully beaten by Defendant Officers.

84.     Alternatively, Doe Officers should have been aware that Defendant Officers were not properly trained on using an appropriate and legal amount of force (if any) when making an arrest because Doe Officers failed to investigate and supervise their officers on a regular basis.  Indeed, when Colonel Lamar Davis (Defendant Davis) was asked whether he was "confident" that there was not another Ronald Greene case out there that LSP did not know about, he responded "[n]o, I'm not" and that LSP has "not looked at every video."[9]  Thus, had Defendant Davis and Doe Officers investigated Defendant Officers' actions, they would have known that Defendant Officers were a danger to society, including to individuals like Mr. Monroe.

## Public Records Requests

85.     Mr. Monroe, through his agent, undersigned counsel, submitted Public Records Requests for more information regarding the circumstances of his beating to obtain further evidence for this action.  The record request sought:

   a)  Records that can identify every officer involved in the Monroe Incident, including, but not limited to, an officer named Matthews, with a badge number of 2831.

   b)  Any internal reports relating to the Monroe Incident, including, but not limited to, any reports written by the officers involved in the incident.

   c)  All body, backseat, and dash-camera footage relating to the Monroe Incident.

---

[9] *See* Jim Mustian & Jake Bleiberg, *In Louisiana, a father, a son and a culture of police abuse*, AP News (Oct. 25, 2021), https://apnews.com/article/business-louisiana-race-and-ethnicity-racial-injustice-baton-rouge-d2d50979a247c400746ba6703225f7ff.

COMPLAINT
DEMAND FOR JURY TRIAL

d) Any records relating to any investigation of the Monroe Incident, including the results of the investigation and the identity of the officer(s) who conducted the investigation.

e) Any records that are open, open but suspended, suspended, or in any other status regarding any prior disciplinary proceedings instituted and/or complaints filed against the officers involved in the Monroe Incident.

f) Any performance reviews, including emails regarding job performance and probationary evaluations for the officers involved in the Monroe Incident.

g) Any records regarding any prior investigations of the officers involved in the Monroe Incident, even if the investigation was unrelated to the Monroe Incident.

h) Any records regarding any trainings that the officers involved in the Monroe Incident have ever been required to attend relating to proper traffic stops, arrest tactics, searches and seizures, the use of excessive force, racial profiling, and/or constitutional rights.

i) Any records regarding any mandatory training programs for officers of the Louisiana State Police Department relating to proper traffic stops, arrest tactics, searches and seizures, the use of excessive force, racial profiling, and/or constitutional rights.

j) Any records regarding the number of complaints made against the Louisiana State Police Department for excessive force in the last five years.

k) Any records regarding the number of arrests made by the Louisiana State Police Department in the last five years.

COMPLAINT
DEMAND FOR JURY TRIAL

l)  Any records regarding the number of arrests and/or citations issued by the Louisiana State Police Department in the last five years for resisting an officer with force or violence.

m) Any records regarding the number of arrests and/or citations issued by the Louisiana State Police Department in the last five years for battery of a police officer.

n)  Any records regarding the number of arrests and/or citations issued by the Louisiana State Police Department in the last five years for assault of a police officer.

o)  Any records regarding the number of arrests and/or citations issued by the Louisiana State Police Department in the last five years for failure to yield to an emergency vehicle.

p)  Any records regarding the Louisiana State Police Department's policies and/or procedures for investigating claims of excessive force.

q)  Any records regarding the Louisiana State Police Department's policies and/or procedures for an officer's use of force against arrestees.

86.     In an email dated July 28, 2021, Adrienne E. Aucoin ("Ms. Aucoin"), counsel for the Department of Public Services and the Office of Legal Affairs, responded that LSP had "begun the process searching for documents" responsive to Mr. Monroe's request and provided notice that "the estimated time reasonably necessary for collection, review, and any necessary redaction of the documents which may be responsive" to the request would be "sixty (60) days."

87.     On August 17, 2021, Lieutenant Melissa Matey, on behalf of the Public Affairs Section of LSP, produced just one document responsive to Mr. Monroe's 17 requests.

COMPLAINT
DEMAND FOR JURY TRIAL

88.     The single redacted document contained LSP's standard use of force policy.  LSP did not explain the reason for the redactions or provide a written response regarding the legal basis for withholding other responsive documents.[10]

89.     On September 20, 2021, counsel for Mr. Monroe served a follow-up Public Records Request to the Louisiana Office of Legal Affairs requesting a written response to Mr. Monroe's first Public Records Request.  This second request once again listed all seventeen requests outlined above in Paragraph 84. It demanded that LSP produce documents responsive to Mr. Monroe's requests (or otherwise explain its basis for not producing documents).

90.     On September 30, 2021, Ms. Aucoin left a message asking counsel to give her a call regarding the Public Records Request, and shortly thereafter, counsel and Ms. Aucoin conferred over the phone.  During that phone conversation, Ms. Aucoin represented that LSP would provide a written response to Mr. Monroe's first Public Records Request, including LSP's basis for withholding responsive documents.  She also represented that LSP would aim to provide a written explanation for the single, redacted document by the end of the week on October 8, 2021.

91.     Despite Ms. Aucoin's representations, Mr. Monroe did not receive a written response from LSP regarding his first Public Records Request, or an explanation for the produced document's redactions.

92.     On November 22, 2021, nearly four months after Mr. Monroe's first Public Records Request, LSP provided one additional document.  The document described the basic training schedule of a police academy cadet and bore no apparent relationship to Defendant Officers.  LSP's delayed response also did not indicate whether LSP had a statutory basis to withhold any documents.

---

[10] Ms. Aucoin later indicated that LSP produced the single, redacted document to several parties simultaneously as the result of several outstanding Public Records Requests.

COMPLAINT
DEMAND FOR JURY TRIAL

93.     Further, Mr. Monroe has still not received a written response from LSP regarding his second Public Records Request.

94.     Mr. Monroe's counsel sent a follow-up email to Ms. Aucoin requesting a written response on October 13, 2021, and October 28, 2021.  To date, there has been no response.

## FIRST CAUSE OF ACTION

### 42 U.S.C. § 1983 – Excessive Force

(as to Defendant Officers)

95.     Mr. Monroe incorporates by reference the factual allegations set forth above.

96.     42 U.S.C. § 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . .

97.     Mr. Monroe is a citizen of the United States.

98.     Defendant Officers are persons, and at all relevant times, they were acting under the color of state law in their capacity as LSP officers.  Defendant Officers' acts or omissions were conducted within the scope of their official duties or employment.

99.     Section 1983 was enacted to protect individuals against state violations of pre-existing civil rights as the "product of congressional concern about the Ku Klux Klan-sponsored campaign of violence and deception in the

17

South,"[11] and as a remedy "against those who representing a State in some capacity were *unable or unwilling* to enforce a state law.'"[12]

100.   At all relevant times, Mr. Monroe had a constitutional right under the Fourth Amendment to be secure in his person from unreasonable seizure through excessive force.  Mr. Monroe also had the constitutional right under the Fourteenth Amendment to bodily integrity and to be free from excessive force by law enforcement.

101.   At all relevant times, Mr. Monroe's rights were clearly established, and any reasonable police officer would have known, or should have known, of these rights.

102.   Defendant Officers' use of force against Mr. Monroe was not reasonable, proportional, justified, or appropriate in light of the facts and circumstances confronting Defendant Officers.  Mr. Monroe was not resisting arrest, at no point ever made any threatening gestures toward Defendant Officers, and did not pose any actual or perceived threat to the safety of Defendant Officers or to any other person.  Thus, Defendant Officers violated Mr. Monroe's Fourth and Fourteenth Amendment rights.

103.   Defendants Officers' use of force constituted deadly force and could have caused death and/or serious bodily injury.

104.   Defendant Officers' use of force was the proximate and direct cause of Mr. Monroe's injuries.

105.   Mr. Monroe suffered actual physical and emotional injuries, and other damages and losses as described herein, entitling him to compensatory and special damages, in amounts to be determined at trial.  As a further result of Defendant Officers' unlawful conduct, Mr. Monroe has incurred special damages, including

---

[11] *Owens v. Okure*, 488 U.S. 235, 249 n.11 (1989) (citations omitted).

[12] *Id.*

COMPLAINT
DEMAND FOR JURY TRIAL

medical expenses. He may continue to incur other expenses related to further medical and other special damages in amounts to be established at trial.

106.   Defendant Officers acted with deliberate indifference to Mr. Monroe's rights, and they acted maliciously, willfully, wantonly, and in reckless disregard of those rights, thus entitling Mr. Monroe to punitive damages.

## SECOND CAUSE OF ACTION

### 42 U.S.C. §§ 1983 and 1985 – Conspiracy

(as to Defendant Officers)

107.   Mr. Monroe incorporates by reference the factual allegations set forth above.

108.   Defendant LSP has a long history of violence, discrimination, and police misconduct against Black people.

109.   Defendant LSP's officers assist each other in carrying out violence against members of the public, particularly Black individuals.

110.   Defendant Officers' actions are consistent with previous racial violence and discrimination against Black people by LSP.

111.   Defendant Officers planned and accomplished an unlawful purpose by violating Mr. Monroe's constitutional rights under the Fourth and Fourteenth Amendments and his civil rights under 42 U.S.C. § 1983, namely, the use of excessive force on Mr. Monroe.

112.   Defendant Officers acted in concert and assisted one another to accomplish the unlawful purpose described above by committing overt and violent acts during the attack on Mr. Monroe, including slamming Mr. Monroe to the ground face down, kneeling on his back with their full body weight, and beating him when he was already unable to move or breathe.

113.   Defendant Officers executed these discriminatory and violent actions with racial animus against Mr. Monroe under the color of law, which resulted in Mr. Monroe's severe physical and mental trauma.

COMPLAINT
DEMAND FOR JURY TRIAL

114.   Defendant Officers are thus conspiratorially liable for all torts and misconduct as set forth in this complaint, pursuant to Louisiana Civil Code § 2324 and 42 U.S.C. § 1983.

115.   Defendant Officers' conspiracy was the proximate and direct cause of Mr. Monroe's injuries.

116.   As a result of Defendant Officers' conspiracy, Mr. Monroe suffered actual physical and emotional injuries, and other damages and losses as described herein, entitling him to compensatory and special damages, in amounts to be determined at trial.  As a further result of Defendant Officers' unlawful conduct, Mr. Monroe has incurred special damages, including medical expenses. He may continue to incur other expenses related to further medical and other special damages in amounts to be established at trial.

117.   Defendant Officers acted with deliberate indifference to Mr. Monroe's rights, and they acted maliciously, willfully, wantonly, and in reckless disregard of those rights, thus entitling Mr. Monroe to punitive damages.

### THIRD CAUSE OF ACTION

### 42 U.S.C. § 1983 *Monell* Liability for Failure to Supervise,

### Investigate, and Decertify

(as to Defendant Davis and Doe Officers)

118.   Mr. Monroe incorporates by reference the factual allegations set forth above.

119.   Defendant Davis and Doe Officers violated Louisiana law because of their failure to supervise and investigate Defendant Officers.

120.   Defendant Davis and Doe Officers were, at all relevant times, employed by LSP.

121.   Defendant Davis and Doe Officers were responsible for hiring, supervising, investigating, and, if necessary, decertifying Defendant Officers.

COMPLAINT
DEMAND FOR JURY TRIAL

122.    On information and belief, Defendant Davis and Doe Officers were aware that Defendant Officers had previously engaged in police misconduct through their use of excessive force, and that such misconduct needed to be immediately corrected to prevent future harm.  Alternatively, Defendant Davis and Doe Officers should have been aware that Defendant Officers had engaged in prior police misconduct, but Defendant Davis and Doe Officers failed to investigate such misconduct.

123.    Defendant Davis and Doe Officers failed to implement any or appropriate policies, training, and/or procedures for Defendant Officers regarding the use of excessive force and/or decertification.

124.    Because of Defendant Davis' and Doe Officers' failure to investigate and implement policies, procedures, and/or training for their officers (including Defendant Officers), Mr. Monroe was ultimately injured.  Defendant Davis' and Doe Officers' failure to investigate and implement policies, procedures, and/or training or a decertification process for Defendant Officers amounts to deliberate indifference, because Defendant Davis and Doe Officers were aware, or reasonably should have been aware, that these failures would result in a constitutional violation.

125.    As a direct and proximate cause of Defendant Davis' and Doe Officers' failure to investigate and implement policies and procedures as they are related to the training of Defendant Officers, Mr. Monroe suffered actual physical and emotional injuries, and other damages and losses as described herein entitling him to compensatory and special damages, in amounts to be determined at trial. As a further result of Doe Officers' unlawful conduct, Mr. Monroe has incurred special damages, including medical expenses. He may continue to incur other expenses related to further medical and other special damages in amounts to be established at trial.

COMPLAINT
DEMAND FOR JURY TRIAL

## FOURTH CAUSE OF ACTION

### L.A. Rev. Stat. § 14:37 – Aggravated Assault

(as to Defendant Officers)

126.   Mr. Monroe incorporates by reference the factual allegations set forth above.

127.   Defendant Officers physically attacked Mr. Monroe without any legal justification or Mr. Monroe's consent.

128.   During their attack of Mr. Monroe, Defendant Officers carried guns, and one of the Defendant Officers drew his gun and pointed it directly at Mr. Monroe.

129.   Mr. Monroe feared for his life and reasonably believed that he was going to be shot and killed.

130.   Defendant Officers' use of a gun constituted assault with a dangerous weapon.

131.   Defendant Officers also used the concrete ground and their bodies as dangerous weapons.

132.   Defendant Officers slammed Mr. Monroe onto the concrete ground with force, which caused Mr. Monroe serious bodily harm and could have killed him.

133.   After Defendant Officers slammed Mr. Monroe onto the concrete ground, they used their bodies to violently restrain Mr. Monroe.

134.   Defendant Officers put their entire bodyweight on Mr. Monroe to keep him pinned to the concrete ground.  While Defendant Officers were twisting and pulling Mr. Monroe's arms, one of the Defendant Officers violently drove his knee with force into Mr. Monroe's kidney.

135.   Defendant Officers used the concrete ground and their bodies in a way that restrained Mr. Monroe's breathing, caused him serious bodily harm, and could have killed him.

COMPLAINT
DEMAND FOR JURY TRIAL

136.   Defendant Officers used the concrete ground and their bodies as dangerous weapons, and their actions constituted assault with dangerous weapons.

137.   Defendant Officers' use of force constituted deadly force and could have caused death and/or serious bodily injury.

138.   Defendant Officers' use of force was the proximate and direct cause of Mr. Monroe's injuries.

139.   Mr. Monroe suffered actual physical and emotional injuries and other damages and losses as described herein, entitling him to compensatory and special damages, in amounts to be determined at trial.  As a further result of Defendant Officers' unlawful conduct, Mr. Monroe has incurred special damages, including medical expenses. He may continue to incur other expenses related to further medical and other special damages in amounts to be established at trial.

<h2 style="text-align:center"><u>FIFTH CAUSE OF ACTION</u></h2>

<h2 style="text-align:center">L.A. Rev. Stat. § 14:34 – Aggravated Battery</h2>

(as to Defendant Officers)

140.   Mr. Monroe incorporates by reference the factual allegations set forth above.

141.   Defendant Officers physically attacked Mr. Monroe without any legal justification or Mr. Monroe's consent.

142.   Defendant Officers used the concrete ground and their bodies as dangerous weapons.

143.   Defendant Officers slammed Mr. Monroe onto the concrete ground with force, which caused Mr. Monroe serious bodily harm and could have killed him.

144.   After Defendant Officers slammed Mr. Monroe onto the concrete ground, they used their bodies to violently restrain Mr. Monroe.

145.   Defendant Officers put their entire bodyweight on Mr. Monroe to keep him pinned to the concrete ground.  While Defendant Officers were twisting

COMPLAINT
DEMAND FOR JURY TRIAL

and pulling Mr. Monroe's arms, one of the Defendant Officers violently drove his knee with force into Mr. Monroe's kidney.

146.   Defendant Officers used the concrete ground and their bodies in a way that restrained Mr. Monroe's breathing, caused him serious bodily harm, and could have killed him.

147.   Defendant Officers used the concrete ground and their bodies as dangerous weapons, and their actions constituted assault with dangerous weapons.

148.   Defendants Officers' use of force constituted deadly force and could have caused death and/or serious bodily injury.

149.   Defendant Officers' use of force was the proximate and direct cause of Mr. Monroe's injuries.  Mr. Monroe suffered actual physical and emotional injuries, and other damages and losses as described herein, entitling him to compensatory and special damages, in amounts to be determined at trial.  As a further result of Defendant Officers' unlawful conduct, Mr. Monroe has incurred special damages, including medical expenses. He may continue to incur other expenses related to further medical and other special damages in amounts to be established at trial.

## SIXTH CAUSE OF ACTION

**L.A. Rev. Stat. Ann. § 14:1 *et seq*. – Violation of Louisiana Public Records Law**

(as to Defendant Cammon)

150.   Mr. Monroe incorporates by reference the factual allegations set forth above.

151.   Under Article XII, § 3 of the Louisiana Constitution and the Public Records Law, La. Stat. § 44:31, *et seq*., a person has the right to examine public documents.  In connection with the excessive force Defendant Officers used against Mr. Monroe, Plaintiff, through undersigned counsel, sought the previously

COMPLAINT
DEMAND FOR JURY TRIAL

listed public records from the records custodians of LSP, under Louisiana's Public Records Law.

152.   To date, the previously mentioned public records have not been received as required by the statute.

153.   To date, the Louisiana Office of Legal Affairs has not: (1) provided notification in writing that it believes one or more of the requested records are not public; (2) provided identification of any of the requested public records that it is claiming an exemption for under the Public Records Act or any other statute; (3) identified any exemption it is claiming for any of the requested public records; or (4) stated its reasons in writing for believing an exemption applies to any of the requested public records as required under La. Rev. Stat. Ann. § 44:32.

154.   To date, the Louisiana Office of Legal Affairs has not certified in writing that any of the requested public records are not immediately available as required under La. Rev. Stat. Ann. § 44:33.

155.   To date, the Louisiana Office of Legal Affairs has not certified in writing that any of the requested public records are not under its custody or control as required under La. Rev. Stat. Ann. § 44:34.

156.   The sixty-day deadline that the Louisiana Office of Legal Affairs set to provide the requested public records has passed. Yet, Mr. Monroe has not received any written response and has received just one responsive document.

157.   Because Mr. Monroe did not receive all of the responsive documents, he served a second Public Records Request.

158.   To date, Mr. Monroe has not received a written response or any responsive documents to his second Public Records Request.

159.   On information and belief, LSP has withheld responsive documents without explaining the basis for withholding those documents.

160.   Thus, Mr. Monroe has been deprived of his rights under the Louisiana Public Records Law and is entitled to injunctive relief and/or issuance of a writ of

COMPLAINT
DEMAND FOR JURY TRIAL

mandamus, attorneys' fees and costs, and damages, including the attorneys' fees incurred for bringing this action.

## **PRAYER FOR RELIEF**

WHEREFORE, Mr. Monroe prays that this Court enter judgment in his favor and against each of the Defendants and grant:

A.    Compensatory and consequential damages, including damages for emotional distress, humiliation, loss of enjoyment of life, and other pain and suffering on all claims allowed by law in an amount to be determined at trial;

B.    Compensation for economic losses on all claims allowed by law;

C.    Special damages in an amount to be determined at trial;

D.    Punitive damages on all claims allowed by law;

E.    Reasonable attorneys' fees and costs;

F.    Pre- and post-judgment interest at the lawful rate; and

G.    Any further relief that this Court deems just and proper, and any other appropriate relief at law and equity.

## **JURY DEMAND**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Mr. Monroe demands a trial by jury.

COMPLAINT
DEMAND FOR JURY TRIAL

Dated: November 24, 2021      Respectfully submitted,


By: _____
Megan E. Snider
LA. Bar No. 33382
Nora Ahmed (*pro hac vice* forthcoming)
ACLU Foundation of Louisiana
1340 Poydras St, Ste. 2160
New Orleans, LA 70112
Tel: (504) 522-0628
msnider@laaclu.org
nahmed@laaclu.org

Jason M. Ohta (*pro hac vice* forthcoming)
Kamilah Alexander (*pro hac vice* forthcoming)
Adam A. Herrera (*pro hac vice* forthcoming)
LATHAM & WATKINS LLP
12670 High Bluff Drive
San Diego, CA 92130
Tel: (858) 523-5400
jason.ohta@lw.com
kamilah.alexander@lw.com
adam.herrera@lw.com

Samantha J. Chang (*pro hac vice* forthcoming)
LATHAM & WATKINS LLP
355 South Grand Avenue, Suite 100
Los Angeles, CA 90071
Tel: (213) 485-1234
sam.chang@lw.com

*Attorneys for Plaintiff Anthony Monroe*

COMPLAINT
DEMAND FOR JURY TRIAL